**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Alec Sanchez,

                   Plaintiff,

v.

Martin O'Malley,[1]
Commissioner of Social Security,

                   Defendant.

No. CV-23-00200-TUC-RM (EJM)

**REPORT AND RECOMMENDATION**

Currently pending before the Court is Plaintiff Alec Sanchez's Opening Brief (Doc. 18).  Defendant filed his Answering Brief ("Response") (Doc. 22), and Plaintiff replied ("Reply") (Doc. 23).  Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g).  Compl. (Doc. 1).

Pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure,[2] this matter was referred to Magistrate Judge Markovich for Report and Recommendation.  Based upon the pleadings of the parties and the administrative record submitted to the Court, the Magistrate Judge recommends that the District Judge DENY Plaintiff's Opening Brief (Doc. 18) and AFFIRM the Commissioner's decision.

. . .

---

[1] The Court takes judicial notice that Kilolo Kijakazi is no longer Acting Commissioner of the Social Security Administration ("SSA").  The Court will substitute the new Commissioner of the SSA, Martin O'Malley, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See also* Fed. R. App. P. 43(c)(2).

[2] Rules of Practice of the United States District Court for the District of Arizona.

## I.     BACKGROUND

### A.     *Procedural History*

On November 19, 2020, Plaintiff protectively filed a Title XVI application for Supplemental Security Income ("SSI"), alleging disability as of January 1, 2017, due to anxiety, asthma, bipolar disorder, schizophrenia, depression, and obesity.  *See* Administrative Record ("AR") at 15–16, 18, 25, 79–81, 87–92, 96, 220, 223, 234, 243, 249, 275, 277.[3]  The Social Security Administration ("SSA") denied his application on February 26, 2021.  *Id.* at 15, 79–87, 98–102.  On April 28, 2021, Plaintiff filed a request for reconsideration, and on July 26, 2021, SSA denied Plaintiff's application upon reconsideration.  *Id.* at 15, 88–108.  On September 13, 2021, Plaintiff filed his request for hearing.  *Id.* at 15, 115–18.  On December 15, 2021, an initial telephonic hearing was held before Administrative Law Judge ("ALJ") Charles Davis.  AR at 15, 54–78.  ALJ Davis held a second telephonic hearing on April 27, 2022.  *Id.* at 15, 31–53.  On May 26, 2022, the ALJ issued an unfavorable decision.  *Id.* at 12–25.  On July 20, 2022, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on April 3, 2023, review was denied.  *Id.* at 1–11, 313–15.  On April 27, 2023, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.     *Factual History*

Plaintiff was twenty-six (26) years old at the time of the alleged onset of his disability and thirty-one (31) years old at the time of the administrative hearings.  AR at 15, 23, 25, 57, 79–80, 87–92, 96, 173, 204, 220, 223, 234, 249, 275, 277.  Plaintiff graduated from high school.  *Id.* at 24, 57, 85, 87–88, 90.  Prior to his alleged disability, Plaintiff worked at Circle K as a cashier.  *Id.* at 57–58, 237, 244–45, 299.

. . .

. . .

. . .

---

[3] Page numbers refer to the page numbers demarcated in the Administrative Record rather than the Court's Case Management/Electronic Case Files ("CM/ECF") page numbers.

### 1. Plaintiff's Testimony

#### a. Administrative Hearings

##### i. December 15, 2021

Plaintiff confirmed that he was thirty-one (31) years old and had graduated from high school. AR at 57. Plaintiff testified that his last job was "around 2016" at Circle K. *Id*. at 57–58. Plaintiff estimated that he worked there for about a year and explained that he left because he "was having a lot of breakdowns and panic attacks[.]" *Id.* at 58. Plaintiff further confirmed that his father passed away around the same time that he quit working. *Id*. Plaintiff indicated that he has looked for work since then, but his medications make him really drowsy. *Id.* at 58–59. Plaintiff explained that although he takes his medications at night, the drowsiness persists the following morning. AR at 58–59.

Plaintiff confirmed that he lives with his mother, his sister, and his nephew. *Id.* at 59. Plaintiff reported that his mother works at Raytheon, but his sister is not employed or disabled. *Id*. Plaintiff described having good days and bad days. *Id.* at 60. Plaintiff testified that on good days he does things that he likes, such as drawing, video games, and hanging out with his nephew. *Id*. Plaintiff reported not getting much done on bad days, and generally trying to use "the tools [he] learned over the groups and stuff[,]" to calm himself down and "help [him] work through [his] problems." AR at 60. Plaintiff testified that he likes to play Avengers, Call of Duty, and a Sonic video. *Id*.

Plaintiff further testified that his medications have caused him to gain weight and cause him to shake, especially his hands. *Id*. Plaintiff denied being able to use a computer much, but reported using a controller to enable him to play video games. *Id.* at 60–61. Plaintiff confirmed that he has a current driver's license and a car to get around town. *Id.* at 61. Plaintiff acknowledged that his mother pays for his car insurance, and he does not receive any other sources of income. AR at 61–62.

Plaintiff testified that he hears voices constantly, every day. *Id.* at 62. Plaintiff explained that when he hears the voices, he cannot hear what someone is saying, which leads him to ask them questions to understand. *Id*. Plaintiff further explained that

sometimes the voices will manipulate what the other person is saying, so he hears something completely different. *Id.* Plaintiff reported that he has heard voices since he was approximately three (3) years old. *Id.*

Plaintiff confirmed that he had worked at Circle K for approximately a year, during which he heard the voices, and admitted that nothing has changed since that time. AR at 62–63. Plaintiff explained that he could not return to a job like the one he had at Circle K because of his panic attacks and having to deal with people. *Id.* at 63. Plaintiff noted that when he had worked at Circle K previously, he was primarily on the third shift—10:30 p.m. to 6:00 a.m., which meant he did not have to deal with many people. *Id.* Plaintiff described his position to be primarily cashier, with very little stocking of goods. *Id.* at 72. Plaintiff testified that while he worked at Circle K he would shake, talk fast, be angry, and sweat. *Id.* at 68. Plaintiff further testified that this behavior would be followed by a panic attack, and he would run into the back of the store and try to calm down. AR at 68. Plaintiff said that the manager would come and check on him. *Id.* Plaintiff confirmed that this behavior occurred the entire time he was employed; however, it became worse after his father died. *Id.* at 68–69. Plaintiff also relayed a story about having an argument with his manager at some point when he was scheduled to work until 9:00 a.m., but no one came to relieve him. *Id.* at 67–68. The manager indicated that she knew about Plaintiff's panic attacks at that point. *Id.* The manager had her own health issues, and asked Plaintiff to stay and work the register until she was ready to leave the company. AR at 69. Plaintiff agreed to stay. *Id.* Ultimately, the same manager let Plaintiff go, and quit herself a few days later. *Id.*

Plaintiff also testified that he had worked at Big 5 selling shoes. *Id.* He was uncertain regarding how long he worked there, but acknowledged that he was a good salesperson. *Id.* at 69–70. Plaintiff explained that he was fired as a result of a miscommunication between managers. AR at 70. One manager told him that he was not on the schedule, then when he went in the next day for a scheduled shift, another manager said that he was a no-call/no-show the previous day and was no longer working. *Id.*

- 4 -

Plaintiff confirmed that he had panic attacks at Big 5, but indicated that they were not as bad. *Id.* at 71.

Plaintiff testified that his father's passing changed his outlook on life and increased his depression and anxiety. *Id.* at 64. Plaintiff further testified that the depression and anxiety had become more manageable, but recently had been getting worse and he had trouble getting out of bed as a result. *Id*. Plaintiff noted that his emotions, which cause a strong reaction, have transferred from anger to sadness since his dad's passing. AR at 64–65. Plaintiff estimated that in the previous month, there were approximately seventeen (17) or eighteen (18) days during which he did not play video games or other activities that he enjoys. *Id.* at 65–66. Plaintiff described his activity on those days to doing nothing except laying down and trying to breath and stop the voices. *Id.* at 66.

Plaintiff acknowledged that he was using a fidget ring to help him stay calm during the hearing. *Id*. Plaintiff confirmed that he uses it daily. *Id*. Plaintiff also opined that his shaking hands were a result of his medications. AR at 66–67. Plaintiff described a recent medication change which resulted in extreme dry mouth; however, it did not stop the shaking. *Id.* at 67. As a result, Plaintiff's doctor advised him to stop taking the medication. *Id*. Plaintiff indicated that during the hearing his mind was racing, and he felt shaky and nervous. *Id.* at 71.

### ii.     April 27, 2022

Plaintiff's counsel questioned Plaintiff regarding what he was trading for drugs on the street. Plaintiff testified that he has bartered his chain, smart watches, cell phones, and tablets. AR at 49. Plaintiff further testified that he got these items "[t]hrough other people that I saw in the local Super Shoot." *Id.* Plaintiff also testified that he would lie to his mother and ask for money to get drinks at the store, use that money to buy a tablet from someone, then swap the tablet at the methadone clinic "to get whatever I want." *Id.*

. . .

. . .

. . .

### b. Administrative Forms

#### i.    Work Background

On an undated form titled "Claimant's Work Background," Plaintiff listed his prior employment at Circle K as a cashier providing customer service from 2015 to 2016. AR at 299. Plaintiff also listed prior work at Hanson's Store, also as a cashier providing customer service, from 2010 to 2011. *Id.* No further information was included.

#### ii.    Function Report—Adult

On December 26, 2020, Plaintiff's mother, Annette Sanchez, completed a Function Report—Adult.[4] AR at 252–59. Plaintiff reported that he lives in a house with family, including his mother, sister, and nephew. *Id.* at 252. Plaintiff described the limitations of his medical conditions as follows:

> Illness is schizophrenia, bipolar, depression, anxiety. Can't work with others. No self control, anger issues, violent outburst, physical shaking from anxiety. Often see and hear things that aren't there. Hard to focus[.]

*Id.* Plaintiff further described his typical day to include waking up around 8–9, going to the clinic for methadone, returning home, eating, taking a shower, taking his evening medications around 7 p.m., and watching television until tired. *Id.* Plaintiff noted that on days when he was feeling badly, he would try to sleep after getting home from the clinic. *Id.* Plaintiff further noted that on days when he felt better, he would do chores such as emptying the trash, cleaning his room, drawing, or playing video games. AR at 253. Plaintiff also reported that on Mondays, he would see his counselor. *Id.*

Plaintiff denied caring for any other people in the home but reported that he was responsible for providing his pets with food and water. *Id.* Plaintiff stated that his mother cleans the litter boxes and takes the animals to the veterinarian. *Id.* Plaintiff reported that

---

[4] Plaintiff's mother also completed a Function Report—Adult—Third Party regarding Plaintiff. *See* AR 260–67. It appears that she filled out the Function Report—Adult on Plaintiff's behalf, although that is not entirely clear. *See, e.g.,* AR at 252 (response indicates that Plaintiff lives with family, including "mother, sister, nephew[.]"). The Court's summary presumes these answers are from Plaintiff, not his mother.

- 6 -

prior to the onset of his condition, he was able to work, participate in sports, and socialize with friends. *Id.* Plaintiff further reported that since the onset of his conditions, he cannot sleep due to bipolar issues, but then sleeps too much due to his medications. AR at 253.

Plaintiff noted that he did not have any problem with his personal care and did not need any reminders to perform personal hygiene. *Id.* at 253–54. Plaintiff indicated that his mother reminds him to take his medications. *Id.* at 254. Plaintiff reported that that although he cannot cook, he can make simple things when his mother does not, and occasionally prepares frozen dinners, cereal, or sandwiches. *Id.* Plaintiff further reported that this type of cooking takes him approximately ten (10) minutes. *Id.* Plaintiff indicated that he tries to do yard work and laundry, but he cannot focus and does not finish these tasks. AR at 254. Plaintiff also noted that his mother will tell him to try and help guide him. *Id.* Plaintiff reported that his inability to focus and anxiety regarding failure are the reasons he does not do house or yard work. *Id.*

Plaintiff stated that he goes outside hourly to smoke cigarettes. *Id.* at 255. Plaintiff also reported that he drives or rides in a car when he goes out and is able to go out alone. *Id.* Plaintiff further indicated that he shops online weekly, and browses for electronics, music, and movies. AR at 255. Plaintiff reported that he is unable to pay bills, count change, handle a savings account, or use a checkbook/money orders, because he has no income. *Id.*

Plaintiff listed his hobbies and interests as drawing, video games, and watching television. *Id.* at 256. Plaintiff reported watching television almost daily and playing video games two (2) days per week. *Id.* Plaintiff described himself as good at both of these activities. *Id.* Plaintiff denied social activities with anyone outside of the family with whom he lives. AR at 256. Plaintiff confirmed that he goes to the clinic daily, and sees a psychiatrist every three (3) months; however, he claims that he does not engage much due to anxiety. *Id.* Plaintiff indicated that his mother accompanies him to doctor's appointments to make sure that he understands the medications and any side effects. *Id.*

Plaintiff reported having difficulty problems getting along with family, friends,

neighbors, or others due to anxiety, his violent outbursts, he feels like his family is judging and talking about him. *Id.* Plaintiff further reported that he does not go out, does not play basketball at the park, and has anxiety when he does go out. *Id.* Plaintiff described his conditions as affecting his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others. AR at 257. Plaintiff indicated that he is not playing sports and has become obese as a result, as well as experiencing medication side effects including hunger, dizziness, and brain fog. *Id.*

Plaintiff reported being left handed and estimated that he can walk for a half of a block before needing to rest for five (5) minutes. *Id.* Plaintiff further reported that he can pay attention for one (1) minute and cannot finish what he starts. *Id.* Plaintiff stated that he cannot follow written or spoken instructions well, because he lacks focus and overthinks to confusion. *Id.* Plaintiff noted that he does not get along well with authority figures and feels anger and violent thoughts. AR at 257. Plaintiff denied having been fired or laid off from a job, indicating that he quits before getting fired. *Id.* Plaintiff also reported that does not handle stress well, and overreacts and overthinks. *Id.* at 258. Plaintiff described his ability to handle changes in routine as "not good" and noted anxiety. *Id.* Finally, Plaintiff reported hearing voices and seeing shadow people, but acknowledged a medication increased has helped. *Id.*

### 2. **Vocational Expert Ronald Hatakeyama, Ph.D.'s Testimony**

Dr. Hatakeyama testified as a vocational expert at the December 15, 2021, administrative hearing. AR at 15, 71–78, 173–75, 303–305. Dr. Hatakeyama classified Plaintiff's position at Circle K as a cashier II, Dictionary of Occupational Titles ("DOT") number 211.462-010, with a Specific Vocational Preparation ("SVP") of 2, unskilled, and light exertional level – both as described and as performed. *Id.* at 73. The ALJ asked Dr. Hatakeyama to consider a hypothetical individual of Plaintiff's age, education, and work history; who could perform a range of work involving simple, routine tasks in a low social context, which the ALJ described as jobs that do not involve dealing with the public as part

of the regular assigned work duties; and only occasional interaction with co-workers and supervisors. *Id.* at 73–74. Dr. Hatakeyama confirmed that such an individual would not be able to perform the cashier job because it would require frequent, to constant, public contact. *Id.* at 74.

Dr. Hatakeyama considered the same hypothetical individual, and after confirming that the individual did not have any exertional limitations, opined that such an individual would be able to perform the job of hand packager, DOT number 920.587-018, medium exertional level, with an SVP of 2, and unskilled, with approximately 90,000 jobs available nationally. *Id.* Dr. Hatakeyama further opined that such an individual could perform the job of kitchen helper, DOT number 318.687-010, medium exertional level, an SVP of 2, and unskilled, with approximately 145,000 jobs available nationally. *Id.* Finally, Dr. Hatakeyama opined that such an individual could perform the job of an assembler, small products, DOT number 706.684-022, light exertional level, an SVP of 2, and unskilled, with approximately 20,800 jobs available nationally. *Id.* Dr. Hatakeyama also opined that "in terms of the Selected Characteristics there would be no public contact." AR at 74–75. Dr. Hatakeyama further testified that the jobs he listed do not require teamwork, so there would be minimal or superficial contact with co-workers, but would require occasional contact with supervisors. *Id.* at 75. Dr. Hatakeyama further opined that he would consider these jobs to involve simple, routine tasks. *Id.* Dr. Hatakeyama opined that there would be minimal changes in work routine, and explained that because the work is repetitive in nature, the jobs would not require too much change in routine. *Id.*

Dr. Hatakeyama confirmed that his testimony was consistent with the DOT and the Selected Characteristics of Occupations ("SCO"). *Id.* Dr. Hatakeyama noted that his opinions regarding dealing with the public, co-workers, supervisors, and low social contacts were based on his professional experience in conducting job analyses. AR at 75.

The ALJ inquired about the hypothetical individual being drawn off task due to trouble maintaining attention and concentration for extended periods of time, or alternatively having trouble maintaining regular attendance, and what limitations the

competitive workplace would tolerate. *Id.* at 75–76. Dr. Hatakeyama opined that regarding absenteeism, one (1) to two (2) absences would be acceptable, but two (2) absences month after month would not be tolerated. *Id.* at 76. Dr. Hatakeyama further opined that he would consider anything beyond ten (10) percent off-task would preclude competitive work due to productivity issues. *Id.* Dr. Hatakeyama testified that he based his absenteeism opinion "on serving employers and substantiated by published articles by vocational rehabilitation professionals." *Id.* Dr. Hatakeyama further testified that his opinions regarding off-task tolerances were based on serving employers, as well as reliance "on the Department of Labor regulations, dealing with what's termed as personal fatigue and delay on jobs[.]" AR at 76.

Plaintiff's counsel asked Dr. Hatakeyama whether an individual who would leave the workstation without warning, for at least five (5) to ten (10) minutes, on an average of three (3) times per shift, and not during regularly scheduled breaks, would be able to maintain employment. *Id.* at 76–77. Dr. Hatakeyama opined that employers would not tolerate such an individual as the unscheduled breaks would be beyond the Department of Labor regulations. *Id.* at 77. Plaintiff's counsel also asked about employment tolerance for an individual who was off-task twenty percent (20%) of the day for half of the month, but less than ten percent (10%) of the day for the other half of month. *Id.* Dr. Hatakeyama noted that he had previously answered this question and reiterated that "the personal fatigue and delay on jobs, say [a] work[er] [] off task 10% or more . . . would preclude any type of competitive employment as it would not conform to standard business practices." *Id.*

### 3. **Vocational Expert Gayle Tichauer's Testimony**

Ms. Tichauer testified as a vocational expert at the second, April 27, 2022, administrative hearing. AR at 15, 49–52, 204–206, 309–311. The ALJ observed that he was uncertain whether Plaintiff's previous employment at Circle K rose to the level of substantial work; however, he asked Ms. Tichauer whether such work would be precluded due to the limitation on dealing with the public. *Id.* at 50. Ms. Tichauer confirmed that Plaintiff's past work would be precluded. *Id.*

The ALJ asked Ms. Tichauer to consider a hypothetical individual of Plaintiff's age and education, and with no past relevant work history; who was limited to simple, routine tasks; and jobs that had no public contact and no high rate production quota. *Id.* Ms. Tichauer opined that such an individual would be employable as a kitchen helper, which she defined as a dishwasher, Dictionary of Occupational Titles ("DOT") number 318.687-010, with a Specific Vocational Preparation ("SVP") of 2, medium exertional level, unskilled, and of which there are approximately 800,000 in the national economy. *Id.* at 51. Ms. Tichauer further opined that such an individual would also be employable as an industrial cleaner or janitor, DOT number 381.687-01,[5] with an SVP of 2, medium exertional level, and of which there are approximately 600,000 positions in the national economy. AR at 51. Ms. Tichauer also opined that such an individual would be able to perform work as a cook helper or a prep cook, DOT number 317.687-010, medium exertional level, with an SVP of 2, unskilled, and approximately 100,000 positions in the national economy. *Id.* Ms. Tichauer confirmed that her testimony was consistent with the DOT and SCO. *Id.*

Ms. Tichauer agreed with Dr. Hatakeyama's prior testimony that if the hypothetical individual was absent two or more times per month on an ongoing basis, such absenteeism would not be tolerated and would lead to termination. *Id.* The ALJ inquired about Plaintiff's prior testimony regarding off-task behavior and what an employer's tolerance for such behavior would be. *Id.* Ms. Tichauer opined that for unskilled work, anything greater than ten percent (10%) would not be acceptable by any employer. AR at 52. Continuing questioning regarding employer tolerances for off-task behavior, Plaintiff's counsel characterized Plaintiff's prior testimony as "going to the back to recover for at least five to ten minutes an average of three times per shift[,]" and expressed his belief that each shift was four (4) hours. *Id.* Ms. Tichauer reiterated her opinion that anything greater than ten percent (10%), or in her estimation more than six (6) minutes per hour not including

---

[5] 318.687-01 is the DOT number reflected in the transcript; however, this number does not exist in the DOT. Cleaner, Industrial (any industry) is listed as 381.687-018.

scheduled breaks, would not be tolerated.  *Id.*

#### 4.  Lay Witness Testimony—Annette Sanchez

##### a.  Administrative Hearing

Plaintiff's mother, Annette Sanchez, testified at the April 27, 2022, administrative hearing.  AR at 43–49.  Ms. Sanchez testified that she works for Raytheon and has been employed there for twenty (20) years.  *Id.* at 43.  Ms. Sanchez further testified that her son Alec (Plaintiff), daughter Stefanie, and grandson Devon live with her in her home.  *Id.* at 43–44.

Ms. Sanchez testified that when Plaintiff was eight (8), she began noticing that he had a lot of anger issues.  *Id.* at 44.  Ms. Sanchez noted that at that time, she did not think it was anything mental—he was her only boy, so she thought it was due to testosterone.  *Id.*  Ms. Sanchez confirmed that Plaintiff reported seeing things as a child, but she did not think much of it and said that he would see things and was afraid of things.  AR at 44.  As an example, Ms. Sanchez noted that Plaintiff could not watch the Lion King, it would make him cry.  *Id.*

Ms. Sanchez testified that the only place that Plaintiff would go was to the methadone clinic in the morning.  *Id.*  She described the methadone clinic as "the drug haven of everybody[,]" and commented that "[e]verybody there has drugs."  *Id.*  Ms. Sanchez noted that "a bunch of people . . . from the streets" were at the methadone clinic, and they "all have drugs and then they're all trying to swap for money or drugs."  *Id.*  Ms. Sanchez opined that Plaintiff did drugs to cope, as a way to get normal.  AR at 44.

Ms. Sanchez indicated that she kicked Plaintiff out of the house when he was seventeen (17) or eighteen (18), after he had graduated from high school.  *Id.* at 44–45.  Ms. Sanchez testified that while Plaintiff was on the streets, she and her husband would search for him in the parks regularly.  *Id.* at 45.  Because Plaintiff living on the streets did not help her or her husband, Ms. Sanchez brought Plaintiff back home with an agreement that he would go to detox.  *Id.*  Ms. Sanchez testified that Plaintiff started detox approximately three (3) times.  *Id.*  Ms. Sanchez further testified that Plaintiff "can function

okay at home[,]" but opined that "when the voices get to him a lot, that's when he uses." AR at 45.

Ms. Sanchez indicated that her husband passed away in 2016, and it was hard on Plaintiff. *Id.* She noted that Plaintiff was in therapy prior to her husband's passing, but after his death, Plaintiff went to Las Emphatica. *Id.* Ms. Sanchez confirmed that she knew about Plaintiff's position at Circle K. *Id.* at 45–46. She expressed surprise about Circle K's leniency with Plaintiff and explained that they gave him time off after his dad died. *Id.* at 46. Ms. Sanchez opined that his manager really liked him and would allow Plaintiff to come and go as he pleased. AR at 46. Ms. Sanchez confirmed that Plaintiff eventually lost the job, and said it was because he was freaking out at work and there were a couple of incidents with fellow employees where Plaintiff was crying in the back room. *Id.* Ms. Sanchez opined that she did not believe Plaintiff could hold down a full-time job. *Id.* at 46–47.

Ms. Sanchez confirmed that her late husband worked for FedEx for twenty (20) years. *Id.* at 47. Ms. Sanchez further reported that none of their other children have the same issues that Plaintiff does. *Id.* Upon questioning by the ALJ, Ms. Sanchez reiterated that Plaintiff swaps for drugs at the methadone clinic. AR at 47–48. Ms. Sanchez also confirmed that after her husband's passing, she accompanied Plaintiff to the methadone clinic daily for approximately two (2) years. *Id.* at 48. Ms. Sanchez acknowledged that during this time, Plaintiff was still able to obtain drugs, but she never saw it happen. *Id.* Ms. Sanchez testified that Plaintiff would trade whatever he had for drugs, noted that "[h]e's got a lot of stuff[,]" and indicated that she did not "know what's in his room." *Id.*

### b. Function Report

On January 21, 2021, Plaintiff's mother, Annette Sanchez, completed a Function Report—Adult—Third Party on behalf of Plaintiff. AR at 260–67. Ms. Sanchez reported that she has known Plaintiff for his entire life and they spend time together daily, and engage in activities such as eating meals, attending doctor appointments, and grocery shopping. *Id.* at 260. Ms. Sanchez indicated that Plaintiff lived in a house with family. *Id.*

Ms. Sanchez described Plaintiff's daily activities as follows:

> Wake up around 9 or 10 to go to clinic daily.  Comes home, eat, if feeling good does chores, draws, plays video games.  If feeling bad will sleep alot.  Take meds around 7 pm. Watch TV.

*Id.* at 261.  Ms. Sanchez reported that Plaintiff does not care for any other people, but does feed and water their pets.  *Id.*  Ms. Sanchez indicated that she changes the animals' litter box and takes them to the veterinarian.  AR at 261.  Ms. Sanchez further noted that prior to his illness, Plaintiff was able to socialize with friends and family—he would go to the park to play basketball, to the mall, to the movies, and to work.  *Id.*  Ms. Sanchez also indicated that Plaintiff will stay up all night if having a bipolar attack, but is otherwise drowsy from his medications and sleeps a lot.  *Id.*  Ms. Sanchez reported that Plaintiff did not have any trouble with personal care.  *Id.*  Ms. Sanchez stated that she reminds Plaintiff to shower and shave, as well as asks him if he took his medication.  *Id.* at 262.

Ms. Sanchez reported that Plaintiff prepares meals daily, if she does not cook, and that these include sandwiches, frozen meals, cereal, and leftovers.  AR at 262. Ms. Sanchez noted that Plaintiff will spend between a half hour and an hour preparing food; however, opined that he does not really cook, so that there has been no change since the onset of his illness.  *Id.*  Ms. Sanchez indicated that Plaintiff's difficulty with preparing meals is because he cannot follow directions without overthinking and anxiety, and he cannot focus. *Id.*  Ms. Sanchez further reported that Plaintiff performs chores including cleaning his room, emptying the garbage and recycling, and washing dishes occasionally.  *Id.*  Ms. Sanchez added that these activities can "take[] days" and Plaintiff does not usually complete a task and will restart it, because he cannot focus.  *Id.*  Ms. Sanchez noted that she reminds Plaintiff to do these tasks.  AR at 262.  Ms. Sanchez also opined that Plaintiff does not do house or yard work because he is obese and cannot stand or bend down very long, has pain in his legs, and becomes anxious.  *Id.* at 263.

Ms. Sanchez also reported that Plaintiff goes outside hourly to smoke.  *Id.*  Ms. Sanchez confirmed that Plaintiff is able to drive a car, as well as be a passenger, and can

go out alone. *Id.* Ms. Sanchez observed that Plaintiff does not shop because he does not have any money, but acknowledged that he browses the internet shopping one (1) to two (2) times per week. *Id.* Ms. Sanchez opined that Plaintiff is unable to pay bills, count change, handle a savings account, or use a checkbook/money orders, because he has "[n]o money, [and] no experience with bills or banks[.]" AR at 263. Ms. Sanchez stated that Plaintiff's ability to handle money has remain unchanged despite his illness. *Id.* at 264.

Ms. Sanchez described Plaintiff's hobbies and interests to include drawing, playing video games, and watching television. *Id.* Ms. Sanchez reported that Plaintiff's ability to do these activities depends upon how he is feeling—when he is feeling well he will do them daily, but when he is feeling poorly, he will only do them once per week. *Id.* Ms. Sanchez observed that Plaintiff did not start these activities until the onset of his illness, and noted that prior to his illness, he was active in sports and going out to socialize. *Id.* Ms. Sanchez described Plaintiff's social activities as spending time with his immediate family at home and noted that this occurs daily. AR at 264. Ms. Sanchez further reported that he goes to the clinic and doctor's appointments on a regular basis. *Id.* Ms. Sanchez indicated that Plaintiff requires reminders to go to these places and opined that he needed someone to accompany him. *Id.*

Ms. Sanchez indicated that Plaintiff had problems getting along with others due to bipolar issues, violent outbursts, thinking people are talking about him, and anxiety. *Id.* at 265. Ms. Sanchez noted that Plaintiff's illnesses affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use his hands, and get along with others. *Id.* Ms. Sanchez reiterated that Plaintiff is obese, cannot do physical work, cannot focus, develops anxiety, and sees things that are not there. AR at 265. Ms. Sanchez noted that Plaintiff is left handed and reported that he can walk one block before needing to rest for five (5) minutes. *Id.* Ms. Sanchez opined that Plaintiff can pay attention for one (1) minute and observed that he does not finish what he starts. *Id.* Ms. Sanchez again reported that Plaintiff has difficulty following written and spoken instructions and noted that he gets anxiety, is

confused, and over thinks instructions. *Id.*

Ms. Sanchez indicated that Plaintiff does not get along with authority figures and describes him as getting violent, and feeling intimidated and angry. *Id.* at 266. Ms. Sanchez denied Plaintiff ever having been fired or laid off and observed that he "[q]uits before getting fired." AR at 266. Ms. Sanchez opined that Plaintiff is not good at handling stress or changes in routine, and noted that these cause anxiety and anger. *Id.* Ms. Sanchez states that Plaintiff has anxiety, fears, hears voices, and sees shadows. *Id.* Ms. Sanchez listed Plaintiff's medications to include Olanzapine and Prazosin. *Id.* at 267.

### 5. Plaintiff's Medical Records

#### a. Treatment records[6]

On August 3, 2016, Plaintiff was seen by Rodric Falcon, PMHNP at La Frontera Center. AR at 316–21. NP Falcon noted that Plaintiff's initial intake occurred on July 1, 2016, and that Plaintiff last used heroin on that date. *Id.* at 316. Treatment records indicate that Plaintiff was clean beginning in 2013 and relapsed in February 2016. *Id.* Plaintiff reported currently being on methadone. *Id.* Review of Plaintiff's systems was unremarkable. *Id.* at 317–19. NP Falcon described Plaintiff's thought processes as clear, logical, relevant, coherent, and goal-directed, without evidence of circumstantiality, tangentiality, looseness of associations, or flight of ideas. AR at 319. Plaintiff's associations also appeared intact. *Id.* NP Falcon reported Plaintiff possessed fair judgment, insight, and reliability; he was alert and oriented to person, date, time, and situation; both his recent and remote memory appeared intact; his language was normal; his concentration and attention span were normal; possessed an average fund of knowledge; exhibited a "depressed" mood; constricted affect; and demonstrated good abstraction of proverbs and symbolization. *Id.* Plaintiff's diagnosis included Schizoaffective Disorder bipolar type. *Id.* Plaintiff reported mood swings, hearing voices,

---

[6] Although the Court has reviewed the entirety of Plaintiff's medical records, its summary is generally limited to records regarding those related to his anxiety, asthma, bipolar disorder, schizophrenia, depression, and obesity. Similarly, the summary mainly focuses on those records which follow his alleged onset date of January 1, 2017.

seeing shadows, and that these symptoms were worse when withdrawing from opiates. *Id.* Treatment records also reflect diagnoses that include heroin and opioid dependence and severe major depression with psychotic features. AR at 321.

On September 9, 2016, Plaintiff established care at El Rio Community Health Center. *Id.* at 683–88. On September 22, 2016, Plaintiff followed up with NP Falcon and reported that "the abilify is working instead of the olanzapine but some trouble sleeping now, still pretty depressed, voices and stuff are gone, more dprepsed [sic] about my dad and more upset." *Id.* at 322. Plaintiff's review of systems and mental examination were unremarkable. *Id.* at 324–26. Plaintiff reported lack of motivation, crying spells, and ruminating on past events including his father's death, but denied suicidal ideation or auditory-/visual-hallucinations. *Id.* at 327.

On November 3, 2016, Plaintiff was seen by NP Falcon and reported a "blah" mood, but improved motivation and energy. *Id.* at 331. Plaintiff further reported continuing methadone treatment, but otherwise sober. AR at 331. Plaintiff's review of systems and mental examination were unremarkable. *Id.* at 333–35.

On January 11, 2017, Plaintiff did not attend a scheduled follow appointment with NP Falcon. *Id.* at 339.

On February 10, 2017, Plaintiff returned for ongoing treatment with NP Falcon. *Id.* at 340–45. Plaintiff reported that he was "doing better" with less depressed mood. *Id.* at 340. Plaintiff reported feeling stable and that the medications were helping. AR at 340. Plaintiff's review of systems and mental examination were unremarkable. *Id.* at 341–43.

On March 6, 2017, Plaintiff was seen by NP Falcon and complained that the Geodon that had been prescribed was not working and caused an increase in auditory-/visual-hallucinations. *Id.* at 346. Treatment records indicate unremarkable review of systems and mental examination. *Id.* at 347–49. NP Falcon also noted that Plaintiff "feel[s] good" regarding mood, although his affect was mildly constricted. *Id.* at 349.

On May 8, 2017, Plaintiff followed up with NP Falcon. AR 352–55. Plaintiff reported that he was "doing better" and had resumed taking olanzapine. *Id.* at 352.

Treatment records indicate that Plaintiff had discontinued gabapentin, resumed Abilify, and tapered off of Zyprexa. *Id.* Records also note that Plaintiff is sleeping well. *Id.* Review of Plaintiff's systems was unremarkable.[7] *Id.* at 353.

On June 15, 2017, Plaintiff returned to NP Falcon for ongoing treatment. AR at 356–61. Plaintiff reported that he was "doing alright" and stable on olanzapine. *Id.* at 356, 359. Review of systems and mental examination of Plaintiff were unremarkable. *Id.* at 357–59. NP Falcon noted Plaintiff's mood as "feel[s] good[,]" although his affect was mildly constricted. *Id.* at 359.

On August 4, 2017, Plaintiff failed to attend a scheduled appointment. *Id.* at 362. On August 11, 2017, Plaintiff was seen by NP Falcon for a follow-up. AR at 363–68. Plaintiff reported that he was "doing well." *Id.* at 363. Treatment records reflect unremarkable review of systems and mental examination. *Id.* at 364–66. Plaintiff's mood indicated that he was "doing good[,]" although his affect was mildly constricted. *Id.* at 366. Treatment records also indicate that Plaintiff was doing well on olanzapine and denied any increased or worsening symptoms. *Id.*

On November 7, 2017, Plaintiff continued his treatment with NP Falcon. AR at 371–76. Plaintiff stated he was good, but NP Falcon noted that he had increased panic and anxiety. *Id.* at 371. Plaintiff's review of systems and mental examination were unremarkable. *Id.* at 372–74. NP Falcon's assessment noted that Plaintiff's mood was variable with depressed moods and increased anxiety and panic. *Id.* at 374. Plaintiff also complained of daily sadness but denied hopelessness or suicidal ideation. *Id.*

On December 15, 2017, Plaintiff returned to NP Falcon for a follow-up. AR at 379–84. Plaintiff reported that he was "[s]till the same[,] nothing has really changed, like with the anxiety that is my real problem." *Id.* at 379. Plaintiff denied auditory-/visual-hallucinations and depressed moods. *Id.* Treatment records reflect unremarkable review of systems and mental examination. *Id.* at 380–82. NP Falcon indicated Plaintiff stated he was anxious. *Id.* at 382. On December 27, 2017, Plaintiff was seen at El Rio Community

---

[7] Treatment records for this date do not contain any mental status examination notes.

Health Center for medication refills. AR at 677–82. Plaintiff's asthma was noted to be moderately severe, with symptom relief with an LA beta-agonist/steroid inhaler. *Id.* at 677. Plaintiff reported some difficulty functioning due to depressed mood and auditory hallucinations, but denied thoughts of death or suicide. *Id.* Plaintiff reported hearing voices since birth. *Id.* Plaintiff also reported moderately severe recurring abdominal pain. *Id.* Review of Plaintiff's symptoms was generally unremarkable, but positive for depression, including difficulty concentrating, feelings of hopelessness, hallucinations, and lack of interest. AR at 678–79. Plaintiff's physical examination was similarly unremarkable, but positive for obesity. *Id.* at 679.

On January 25, 2018, Plaintiff did not attend a scheduled visit with NP Falcon. *Id.* at 385–88. On February 16, 2018, Plaintiff was seen at El Rio Community Health Center for anxiety and depression and liver function tests. *Id.* at 670–76. Treatment records indicate that Plaintiff "does not present with anxious/fearful thoughts, compulsive thoughts, difficulty concentrating, hallucinations, paranoia, poor judgment, restlessness or thoughts of death or suicide." *Id.* at 670. Records further reflect that Plaintiff was "taking olanzapine for schizophrenia and eszopiclone for insomnia, and is doing well." AR at 670. Plaintiff's depression screening was negative, and he was reported to be doing well. *Id.* at 670, 674. Plaintiff was noted to be a heavy tobacco smoker. *Id.* at 670–71. Review of Plaintiff's systems and physical examination were unremarkable. *Id*. at 672–73.

On March 1, 2018, Plaintiff saw NP Falcon for ongoing treatment. *Id.* at 389–94. Plaintiff reported that "[t]he two meds didn't really work, the one for hunger didn't help after a few days and anxiety med not working as well either[,] I stopped them after about three weeks." AR at 389. NP Falcon noted that Plaintiff was "focusing on therapy and breathing techniques[,]" but that Plaintiff reported these were not always effective, and he had continued anxiety. *Id.* Plaintiff also reported that he had intermittent but less voices, and denied depressed mood or suicidal ideations. *Id.* Review of systems and mental examination of Plaintiff were unremarkable. *Id.* at 390–92. NP Falcon observed that "weight is stabilizing but if not using olanzapine, p[atient] is very anxious." *Id.* at 392.

On June 1, 2018, Plaintiff did not check in, so appointment was rescheduled. AR at 395. On June 19, 2018, Plaintiff followed up with NP Falcon. *Id.* at 396–401. Plaintiff reported that Lithium helped with auditory- and visual-hallucinations, but it did not help with his anxiety. *Id.* at 396. Plaintiff further reported that his mood was stable, but he was still having panic attacks. *Id.* Plaintiff indicated that his mother would give him her clonazepam as needed. *Id.* Plaintiff's review of systems and mental examination were unremarkable. AR at 397–99. On June 20, 2018, Plaintiff was seen at El Rio Community Health center for follow-up regarding sonogram results for fatty liver disease and obesity. *Id.* at 663–69. Plaintiff noted to be a heavy tobacco user. *Id.* at 663. Review of Plaintiff's systems and physical examination were unremarkable, but positive for obesity. *Id.* at 665–66. Treatment records reflect that Plaintiff's depression was stable. *Id.* at 667.

On September 21, 2018, Plaintiff returned to NP Falcon for a follow-up. AR at 402–407. Plaintiff reported that he was "good" and stated, "It's going better a lot better." *Id.* at 402. Plaintiff also reported that he was unable to get Lunesta but was doing okay without it. *Id.* NP Falcon noted that Plaintiff's mood was stable and he had been sleeping fine without the Lunesta. *Id.* NP Falcon also noted that Plaintiff was using clonazepam as necessary, and that he found it helpful. *Id.* Treatment records reflect unremarkable review of systems and mental examination. AR at 403–405.

On December 18, 2018, Plaintiff continued treatment with NP Falcon. *Id.* at 408–13. Plaintiff reported that he was "doing well." *Id.* at 408. NP Falcon noted that Plaintiff had occasional backslide of mood symptoms but was otherwise functioning well. *Id.* Plaintiff denied suicidal ideations and indicated he was feeling stable for the most part. *Id.* Plaintiff's review of systems and mental examination were unremarkable. AR at 409–411. NP Falcon's assessment noted that Plaintiff denied backslides in mood and psychosis. *Id.* at 411. NP Falcon further noted that Plaintiff's auditory- and visual-hallucinations are exacerbated by stressors or occur with panic. *Id.*

On March 18, 2019, Plaintiff saw NP Falcon for ongoing treatment. *Id.* at 414–20. Plaintiff reported that he was not doing well since last appointment, feeling sick and having

side effects, including hand tremors, frequent urination, extreme thirst, weakness, and feeling hot/cold. *Id.* at 414. Plaintiff reduced his Lithium and reported feeling anxious "a lot." AR at 414. Treatment records reflect generally unremarkable review of systems and mental examination. *Id.* at 415–17. NP Falcon noted Plaintiff reported his mood as "very anxious" and his affect as "serious." *Id.* at 417. NP Falcon assessed that Plaintiff's "voices are pretty well controlled but still a lot of anxiety most days with intermittent panic, not [sic] clear focal point or unprovoked episodes." *Id.*

On May 13, 2019, Plaintiff returned to NP Falcon for continuing treatment. *Id.* at 421–34. Plaintiff reported feeling "better now" and stopped taking Lamictal due to a rash reaction. AR at 421, 428. Treatment records reflect that Plaintiff was feeling stable, sleeping well, and denied side effects. *Id.* Review of systems and mental examination of Plaintiff were generally unremarkable. *Id.* 422–24; 429–31. Plaintiff reported that the auditory-hallucinations are well controlled, but he continues to have "anxiety most days with intermittent panic[.]" *Id.* at 424.

On September 10, 2019, Plaintiff was seen by NP Falcon for ongoing treatment. *Id.* at 435–40. Plaintiff reported that he was "[g]ood, stable, not bad anything." AR at 435. Plaintiff further reported that his mood was stable, and he was sleeping better. *Id.* Plaintiff's review of systems and mental examination were unremarkable. *Id.* at 436–38. Treatment records reflect stability and improved mood and affect. *Id.* at 438.

On October 10, 2019, Plaintiff was seen by Zeenat Chowdhury Jackson, M.D. at El Rio Health for a preventative medicine visit, as well as asthma and dry eye follow-up. *Id.* at 657–62. Plaintiff's body mass index indicated obesity. AR at 657. Treatment records note Plaintiff's asthma is moderately severe, and symptoms are relieved with steroid inhaler use. *Id.* at 659. Plaintiff's dry eye discomfort was noted to be intermittent. *Id.* Plaintiff admitted that he did not drink enough water. *Id.* Depression screening indicated mild depression. *Id.* Treatment records indicate Plaintiff was a heavy tobacco smoker. AR at 660. Plaintiff's review of systems and physical examination were unremarkable. *Id.* at 660–61.

On December 9, 2019, Plaintiff continued treatment with NP Falcon and reported that he was doing well. *Id.* at 441–46. NP Falcon noted that Plaintiff's mood was stable, he reported sleeping better, and denied backslides in mood. *Id.* at 441, 444. Plaintiff reported variability in voices but found them easier to ignore. *Id.* Review of systems and mental examination of Plaintiff were unremarkable. AR at 442–44.

On March 2–3, 2020, Plaintiff expressed concerns to Maureen Accurso, MSC, BHT at Community Medical Services regarding auditory- and visual-hallucinations that he was experiencing. *Id.* at 716–17. Ms. Accurso encouraged Plaintiff to discuss these symptoms with NP Falcon. *Id.* On March 9, 2020, Plaintiff saw NP Falcon for ongoing treatment. *Id.* at 447–53. Plaintiff reported being okay, but his anxiety was "really bad." *Id.* at 447. Plaintiff further reported an inability to make plans due to concerns of having a panic attack. AR at 447. Plaintiff denied nightmares and indicated that he was sleeping well. *Id.* Plaintiff's review of systems and mental examination were unremarkable. *Id.* at 448–50. NP Falcon noted that Plaintiff reported feeling stable and denied depression backslides. *Id.* at 451.

On April 22, 2020, Plaintiff spoke with Ms. Accurso at Community Medical Services. *Id.* at 706. Plaintiff reported having auditory- and visual-hallucinations for some months and indicated that "darkness" was more prevalent. AR at 706. Plaintiff further reported having called La Frontera to see if he could see his psychiatrist sooner. *Id.* Plaintiff also reported "that he is no longer taking the 'gummies with the meth in them[.]'" *Id.* Records reflect that Plaintiff had been testing positive for methamphetamine the previous few months, and he indicated that "it must have been in the marijuana gummies" he was getting from the street. *Id.*; *see also* AR at 701. On April 23, 2020, Plaintiff completed an assessment for continuing services at La Frontera Center with Lucas Porter, BHT, Recovery Coach. AR at 538–48. Regarding symptoms, Plaintiff reported a lack of motivation for 2–3 of seven (7) days; insomnia for 1–2 of seven (7) days; depressed mood for 2–4 of seven (7) days; and anxiety/panic for 4–8 of thirty (30) days. *Id.* at 538. Plaintiff denied any issues with his ability to interact with others. *Id.* at 540. Plaintiff further denied

any substance use (opiates/narcotics) during the previous twelve (12) months. *Id.* at 542. Plaintiff also denied tobacco use. *Id.* Plaintiff reported that he did not have a history of being a danger to himself or others. AR at 543. Plaintiff further reported "some mood congruent visual hallucinations movement and darting shadows." *Id.* Mr. Porter noted that Plaintiff presented with a casual appearance; appropriate behavior; coherent speech; appropriate language; good attention and concentration; adequate fund of knowledge; concrete thought process; relaxed mood; affect appropriate to thought content; no abnormal thought content; good insight and judgment; oriented to person, place, situation, and time; and intact recent and remote memory. *Id.* at 545–46. Plaintiff reported three (3) years of sobriety from heroin, and that he was "looking for work daily, but it [was] hard for him to find." *Id.* at 547. Plaintiff further reported improved familial relationships with sobriety and medication compliance. *Id.* Plaintiff also reported that auditory-/visual-hallucinations were well controlled with medication, as were his anxiety symptoms. AR at 547. Plaintiff also indicated that his hallucination symptoms were mood congruent. *Id.*

On June 5, 2020, Plaintiff returned to NP Falcon for ongoing treatment. *Id.* at 454–60. Plaintiff reported that he was "doing good, I want to go up on the Prozac and fel [sic] like it is kind of working, still a little depressed and lazy or not motivated." *Id.* at 454. NP Falcon noted that Plaintiff reported continued anxiety with some mild and intermittent irritable moods and auditory-/visual- hallucinations which were manageable, was sleeping well, and was able to lose weight with diet and exercise. *Id.* at 454, 458. Review of systems and mental examination of Plaintiff were unremarkable. AR at 455–57.

On September 1, 2020, Plaintiff was seen by NP Falcon for continuing treatment. *Id.* at 461–67, 554–58. Plaintiff reported that he was "doing a lot better, with a lot of the visual and hearing stuff if [sic] probably gone, and think because of the olanzapine, works perfect for me." *Id.* at 461, 554. NP Falcon noted that Plaintiff was doing well and reported his psychosis was mostly resolved, denied side effects and weight gain, reported stable sleep, and some depressed days thinking about his father. *Id.* Review of systems and mental examination of Plaintiff were unremarkable. *Id.* at 462–64, 555–56.

On December 11, 2020, Plaintiff saw NP Falcon for a follow-up visit. AR at 468–74, 559–63. Plaintiff reported that he was "doing good[,] [i]t's all stopped." *Id.* at 468, 559. Treatment records reflect that Plaintiff reported his mood was stable, mild shakiness, no auditory- or visual-hallucinations since his last medication adjustment, was sleeping well, and denied suicidal ideations or backslides in mood. *Id.* at 468, 471, 559, 562. Plaintiff's review of systems and mental examinations were unremarkable. *Id.* at 469–71, 560–61.

On January 11, 2021, Breana Fitzgerald, BHT, Recovery Coach from La Frontera called Plaintiff to check-in with him. *Id.* at 574–75. Plaintiff reported that things were going well, and he was taking his medications without concern. AR at 574. Ms. Fitzgerald's assessment indicated that Plaintiff was "friendly, spoke clearly, reports he is doing well, benefiting from medications, and does not feel he needs any other services or support at this time." *Id.* at 575.

On March 9, 2021, Plaintiff continued treatment with NP Falcon. *Id.* at 589–93. Plaintiff reported that "everything [wa]s going pretty good." *Id.* at 589. Plaintiff further reported stable mood, good sleep, "mild shakiness but deemed as intermittent," and mild and declined side effects from medication. *Id.* Plaintiff's review of systems and mental examination were unremarkable. AR at 590–91. NP Falcon noted that Plaintiff denied backslides in mood. *Id.* at 592.

On June 3, 2021, Plaintiff returned to NP Falcon for ongoing treatment. *Id.* at 594–98. Plaintiff reported that "[e]verything is going pretty good, but you know what really goes on in my life." *Id.* at 594. Plaintiff further reported auditory-/visual-hallucinations, but noted improved insight and discernment with medication. *Id.* Plaintiff also indicated that symptoms were intermittent but "still has instances that affect daily functioning." AR at 594. Plaintiff reported stable mood, good sleep, mild anxiety, as well as mild and declined medication side effects including constipation and mild, intermittent shakiness. *Id.* at 594, 597. Plaintiff also denied suicidal ideation and backslides in mood. *Id.* at 594. NP Falcon noted that these reports were "in context of using fentanyl 5/16/21 after father

passed away." *Id.* Review of systems and mental examination of Plaintiff were unremarkable. *Id.* at 595–96.

On August 31, 2021, was seen by NP Falcon for ongoing treatment. AR at 622–26. Plaintiff reported that "[e]verything [wa]s going pretty good." *Id.* at 622. Plaintiff further reported being sober since last appointment and acknowledged "one day slip prior to last appointment." *Id.* Plaintiff indicated that he was not on methadone at that time. *Id.* Plaintiff also reported auditory- and visual-hallucinations resolved with increased olanzapine, stable mood and sleep, and denied side effects. *Id.* at 622, 625. Review of Plaintiff's systems and mental examination were unremarkable. AR at 623–24.

On September 8, 2021, Plaintiff attended a counseling session with Mara Zavala at CMS. *Id.* at 775. Plaintiff discussed "substance abuse with methadone dose not being therapeutic[,] . . . [and that] he is not going to go inpatient due to his mother not agreeing with him being away form [sic] home when he is the one helping around." *Id.* On September 20, 2021, Plaintiff was seen by Dr. Jackson at El Rio Health clinic for a preventative medicine visit. *Id.* at 651–56. Treatment records reflect a negative depression screening. *Id.* at 652. Plaintiff's hyperlipidemia was noted as stable. AR at 653. Dr. Jackson indicated that Plaintiff was compliant with his medication and trying to lose weight. *Id.* Treatment records indicate that Plaintiff is a light tobacco smoker. *Id.* at 654. Review of Plaintiff's systems and physical examination were unremarkable. *Id.* at 654–55.

On November 4, 2021, Plaintiff continued treatment with NP Falcon. *Id.* at 627–31, 993–97. Plaintiff reported doing "alright" and that "[e]verything [wa]s going pretty good." AR at 627, 993. Plaintiff reported continued sobriety since previous appointment and that he was again on medication assisted treatment ("MAT") without changes. *Id.* Plaintiff further reported continued, intermittent auditory-/visual-hallucinations, which were sometimes worse. *Id.* Plaintiff complained of over sedation on Zyprexa, but voices and paranoia on lower dose. *Id.* Plaintiff's review of systems and mental examination were unremarkable. *Id.* at 628–29, 994–95. Plaintiff complained of "depressed moods but

- 25 -

tied to grief and loss concerns." AR at 630, 996. Plaintiff also indicated occasional shakiness with Zyprexa. *Id.* On November 10, 2021, Plaintiff attended a counseling session with Mara Zavala at CMS. *Id.* at 755. Plaintiff discussed not having used illicit substances and feeling tired. *Id.* Plaintiff further discussed being able to think clearly, continuing to write music, and playing video games. *Id.* Plaintiff also discussed taking care of his nephew and talked about how irresponsible his sister is. AR at 755. On November 15, 2021, Kassandra Morena, PRSS, BHT, Recovery Coach at La Frontera contacted Plaintiff. *Id.* at 1014–15. Plaintiff reported that "his new medications have been working fine however has experienced dry mouth." *Id.* at 1014. Plaintiff further reported relapse on fentanyl and Xanax. *Id.* On November 29, 2021, Plaintiff attended a counseling session with Mara Zavala at Community Medical Services. *Id.* at 752. Plaintiff reported that he was doing well without any additional changes or concerns. AR at 752. Plaintiff also discussed his inability to work a normal shift of drive long distances. *Id.* Additionally, Plaintiff "discussed his mother prevent[ing] him from doing things as he might need assistance." *Id.* Plaintiff also reported taking a "pill" but had lasted three (3) weeks prior without using. *Id.*

On December 1, 2021, Plaintiff called La Frontera to reschedule his update for the third time until the following day, December 2nd. *Id.* at 1019. On December 2, 2021, Plaintiff underwent a clinical assessment at La Frontera and his treatment plan updated. AR at 1003–1013. Plaintiff reported delusions and hallucinations three (3) days out of seven (7) beginning at age two (2). *Id.* at 1003. Plaintiff reported that he forgets personal hygiene tasks often. *Id.* at 1004. Plaintiff further reported that he obtains income by "sell[ing] things he doesn't need and cuts hair on the side." *Id.* Plaintiff stated, "that he began smoking and injecting heroin at the age of 24." *Id.* at 1006. Plaintiff also reported "getting sober in 2017 for 3 years and was miserable and relapsed." AR at 1006. Plaintiff stated that after his father passed in 2016, he "need[ed] to move back in and take care of his Mom and hi[s] sister." *Id.* Plaintiff's mental status examination was unremarkable. *Id.* at 1007–08. On December 16, 2021, Plaintiff reported to Liliana Atiyeh, BHT at La

Frontera that he had used "street Adderall" but CMS did not stop his methadone dose. *Id.* at 1024. Plaintiff acknowledged that "the Zyprexa has helped eliminate most visual hallucinations and has decreased the audio hallucinations[.]" *Id.* Plaintiff denied suicidal or homicidal ideations. AR at 1024.

On January 18, 2022, Plaintiff saw NP Falcon for ongoing treatment. *Id.* at 998–1002. Plaintiff reported that "[e]verything is fine." *Id.* at 998. Plaintiff further reported that he had some relapses, but denied voices or hallucinations. *Id.* Plaintiff complained of daily anxiety and panic attacks, but reported that he was "mostly staying at home[.]" *Id.* Review of Plaintiff's systems and mental examination were unremarkable. *Id.* at 999–1000. Plaintiff informed Joseph McDonald, BHT, Recovery Coach at La Frontera that "his anxiety has been very high because his Mom and [sic] has not been well and the medication he is taking doesn't work all the time for him." AR at 1028.

On February 1, 2022, Plaintiff had a counseling session with Mara Zavala at CMS. *Id.* at 1068. Plaintiff reported that "he continues to be busy with taking care of his mother and now his nephew." *Id.* Plaintiff further reported that he was still taking "benzos and Adderall." *Id.* On February 8, 2022, Plaintiff attended counseling with Bryan Hamilton at CMS. *Id.* at 1067. Plaintiff reported that he continues to take pills. AR at 1067. On February 23, 2022, Plaintiff attended counseling with Liliana Atiyeh, BHT at La Frontera. *Id.* at 1033–34. Plaintiff reported that he had been spending time with his mother who was very sick for the previous two (2) months. *Id.* at 1033. Plaintiff also reported using his "Adderall stash" to get up and going. *Id.* Plaintiff further reported still hearing two (2) voices, but noted that he does not talk to the third voice. *Id.* Plaintiff indicated that he is unable to work because of his symptoms and taking care of his mom. AR at 1033. Plaintiff also reported that he is working on a big art project and playing video games, although he needs to work on limits to his game play. *Id.*

On March 4, 2022, Plaintiff saw Mara Zavala for counseling at CMS. *Id.* at 1058. Plaintiff reported he was doing fine and did not have any concerns, although he also reported taking a pill. *Id.*

### b. Consultative Examiners

#### i. *Noelle Rohen, PhD*

On January 26, 2021, Plaintiff was seen by Noelle Rohen, PhD for a consultative examination upon referral from the Arizona Department of Economic Security ("AZDES"). AR at 582–88. Dr. Rohen noted that her evaluation of Plaintiff was "based upon clinical interview, [Mini-Mental Status Examination (MMSE)], and records provided by DDSA (LFC psych notes, 9/20 and 11/20)." *Id.* at 582. Plaintiff was driven to the evaluation by his mother. *Id.* Plaintiff reported that he was seeking disability because since his father's death in 2016, it has "been really hard to [sic] me to work." *Id.* Plaintiff indicated that he cries uncontrollably, and "get[s] way too nervous." *Id.* Plaintiff further indicated that suffered a head injury in the third grade. AR at 582. Plaintiff also reported that he thought he recovered; however, he also began hearing an evil voice after that. *Id.* Plaintiff denied any history of seizures, stroke, central nervous system infection, brain surgery or period without oxygen. *Id.*

Plaintiff also reported hallucinations beginning around age four (4) during a bout with the flu. *Id.* Plaintiff indicated that the voices have continued as he has gotten older, and described three (3) that he talks to, as well as other, less distinct, auditory-hallucinations. *Id.* at 582–83. Plaintiff further indicated seeing shadow people, as well as colors. AR at 582–83. Plaintiff confirmed that medications help. *Id.* at 583. Plaintiff observed that when he becomes flustered, "words run in front of his eyes so quickly that he cannot respond like he wants to." *Id.* Plaintiff reported depression and anxiety since childhood. *Id.* He denied abuse, neglect, or trauma at home, but indicated that he was bullied at school. *Id.*

Plaintiff endorsed moods from depressed to extreme happiness. AR at 583. Dr. Rohen observed that Plaintiff's medical records that she reviewed suggested his depression was well-managed. *Id.* Plaintiff described anger as the prominent emotion that has been lessened by medication, and that he cries now instead. *Id.* Plaintiff confirmed that he sleeps well with medication, eight (8) hours per night, unless there is an upcoming stressor.

*Id.* Plaintiff reported that his daytime energy varies depending upon his mood. *Id*. Plaintiff did not exhibit difficulty with personal hygiene. AR at 584. Plaintiff reported that when he is not depressed, he is content and happy. *Id.* at 583. Plaintiff denied euphoria or talking too much. *Id*. Plaintiff further reported that when his mood is good, he does not have trouble going to sleep. *Id.* Plaintiff described seriously beating an individual who provoked him, describing that he "snapped." *Id*. Plaintiff expressed continued regret and noted that he will cry in the present about past regrets. AR at 583. Dr. Rohen observed that "[t]he only clear possible symptom of a bipolar disorder writer can elicit is impulsive temper that was a problem about a decade ago." *Id.* Plaintiff reported first seeking behavioral health treatment in middle school, and his high school required him to take anger management classes, then referred him for outside treatment. *Id*. Plaintiff further reported that as an adult, he began treatment during detox in approximately 2012, and has received treatment since then. *Id.* Plaintiff reported his current medications to include Prozac, prazosin, olanzapine, and clonazepam, and indicated these have helped, with olanzapine reducing all symptoms. *Id*. Plaintiff also reported receiving methadone through Community Medical Services ("CMS"). AR at 584.

Plaintiff reported his last employment at Circle K in 2016 and indicated that after approximately eighteen (18) months he was "let go for 'personal reasons, family reasons,'" following his father's death. *Id.* Plaintiff denied performance, personality, or attendance problems. *Id.* Plaintiff further reported that he earned his high school diploma and was in the top twenty-five (25) in his class. *Id.* Plaintiff also denied using alcohol or recreational drugs, although uses medical marijuana sometimes for sleep. *Id*. Plaintiff indicated his substance abuse issues began in the 5th grade, and he quit in 2016 when his dad died. AR at 584. Plaintiff reported that he lives with his mother, middle sister, and nephew. *Id.* Plaintiff further reported that he spends his day caring for his nephew, because his sister is "not really a good mom so I'm the dad." *Id.* Plaintiff indicated that he helps his nephew "with his online schooling, microwaves food for him, 'whatever he needs.'" *Id.* Plaintiff also reported that he "does some housecleaning, does his laundry, and goes with his mother

to grocery shop[,]" or goes alone if she makes a list." *Id.* Plaintiff denied difficulty managing money. AR at 584. Plaintiff noted that he has regular contact with his mother, who is supportive, but that he does not socialize because his friends continue to use. *Id.*

Dr. Rohen indicated that Plaintiff exhibited adequate hygiene and grooming, appropriate dress, and good eye contact, but was nervous. *Id.* at 584–85. Plaintiff's mother accompanied him to the appointment for support but agreed to wait in the waiting room. *Id.* Dr. Rohen noted that Plaintiff's anxiety "definitely attenuated but did not disappear." *Id.* at 585. Dr. Rohen further described Plaintiff as pleasant, cooperative, and an earnest historian. AR at 585. Dr. Rohen noted Plaintiff's affect was limited "to a look of apprehension"; his thoughts were linear and coherent; memory appeared fair to provide history; fund of knowledge average; speech rate rapid with mild press; and he exhibited mild hand shaking. *Id.* Dr. Rohen expressed uncertainty whether this last was resultant from anxiety or a side effect of his medication, as reported in the medical records. *Id.*

Dr. Rohen administered the Folstein Mini Mental Status Examination ("MMSE"). *Id.* Plaintiff scored 29 out of a possible 30 and was alert and oriented to four (4) spheres. *Id.* Dr. Rohen further noted that Plaintiff succeeded in reversing the spelling of a common word, and was able to register three (3) unrelated words after a single exposure and recall two (2) of them after a brief delay and interference. AR at 585. Dr. Rohen's diagnostic impressions included unspecified schizophrenia spectrum and other psychotic disorder, unspecified anxiety disorder, unspecified depressive disorder, and heroin use disorder on methadone maintenance. *Id.* Dr. Rohen opined that Plaintiff's "main issue today looks to be his anxiety." *Id.* Dr. Rohen further opined that "depressive amotivation has the potential to interfere with his persistence." *Id.* Dr. Rohen also posited that "[i]f psychosis is still active, or becomes more active under high demand, this as well may interfere with his persistence or focus." *Id.* Dr. Rohen admitted that aside from the passage of time, she could not "account for the discrepancy between his provider's description of stability and absence of complaints, versus claimant's expressed concerns today[.]" AR at 585. Dr. Rohen opined that Plaintiff would be capable of managing benefits on his own behalf or to

ask his mother for help. *Id.* at 586.

On the same date, Dr. Rohen completed a Psychological/Psychiatric Medical Source Statement regarding Plaintiff. *Id.* at 587. Dr. Rohen confirmed that Plaintiff's conditions would impose limitations for twelve (12) months. *Id.* Dr. Rohen described Plaintiff's understanding and memory as "[a]dequate for today's demands and for MMSE tasks." *Id.* Dr. Rohen further observed that Plaintiff's sustained concentration and persistence were adequate for that day's demands, and that he was clearly anxious. AR at 587. Dr. Rohen posited that "anxiety can interfere with concentration and persistence[.]" *Id.* Dr. Rohen also observed that Plaintiff reported "poor persistence during times of greater depression," but that she could not independently verify this claim. *Id.* Dr. Rohen noted that Plaintiff was appropriately dressed, groomed, and exhibited appropriate social skills. *Id.* Dr. Rohen expressed uncertainty regarding the effect Plaintiff's anxiety would have in a work environment. *Id.* Dr. Rohen opined that Plaintiff could learn new tasks and avoid hazards, but with his complaints of anxiety, may be happier in a lower demand and more static position." AR at 587. Dr. Rohen reiterated her opinion that Plaintiff was capable of managing his own benefits payments. *Id.*

### ii.   *Betty L. Borden, Ph.D.*

On April 27, 2022, Betty L. Borden, Ph.D. testified as a medical expert at the second administrative hearing. AR at 15, 34–43, 985–92. Dr. Borden confirmed that she had reviewed the medical evidence in the case. *Id.* at 34. Dr. Borden testified that the medical evidence of record established the existence of a medically determinable mental impairment. *Id.* at 35. Dr. Borden described these impairments to include a history of opioid use disorder, major depressive disorder with psychotic features, and stimulant use disorder with abuse of amphetamine and methamphetamine. *Id.*

The ALJ expressed his hope that Dr. Borden could assist in clarifying the drug addiction or alcoholism issue that was present. *Id.* The ALJ asked Dr. Borden whether "in [the] absence of claimant's . . . stimulant use disorder, the claimant's mental impairments m[et] or equal[ed] a listing?" AR at 35. Dr. Bordon opined that she did not believe that in

the absence of the stimulant use disorder, Plaintiff's mental impairments would meet or equal a listing. *Id*. Dr. Borden observed that:

> [I]t seems as though the claimant has the drug testing is showing that he has consistently used methamphetamine over a fairly long period of time. Within 8F, we have a number of positive tests for methamphetamine and amphetamine from 2020 going through 2020, 2021, and the more recent treatment records are also indicating . . . methamphetamine, ongoing methamphetamine abuse. So the opioid abuse, there's also some opioid abuse apart from the methadone use, which he's prescribed methadone on a daily basis. But also a number of the tests have indicated positive testing for fentanyl and other kind of opiate. So because it seems as though there's ongoing use of amphetamine and some ongoing use of opiates apart from methadone, it's difficult to say what, what impairments the claimant would have were he to be sober from those substances because we just don't have a clear period of sobriety in the file.

*Id.* at 35–36. The ALJ next inquired why Plaintiff was continued on methadone while continuing to test positive for street drugs. *Id*. at 36. Dr. Borden questioned why Plaintiff's methamphetamine abuse was not addressed more aggressively in treatment, but observed that Plaintiff's methadone dosage was decreased given the positive drug tests. *Id.* Dr. Borden confirmed that since November 19, 2020, there was no period of sobriety sufficient to allow her to parse out the drug addiction or alcoholism from any other behavioral health disorder. AR at 36–37. Dr. Borden reiterated that from November of 2020 to January of 2021, the drug tests indicate ongoing stimulant use problems. *Id.* at 37.

Dr. Borden further opined that the mental status examinations do not appear to indicate a marked impairment, rather they describe Plaintiff as fairly stable. *Id.* Dr. Borden observed that:

> Sometimes he's having problems with mood, but really not indicating the mental status exams are fairly normal apart from, you know, saying that the claimant is sometimes reporting hallucinations, but I've seen in the notes from La Frontera that the claimant is – his memory is okay. Judgment is okay. Mood is okay.

*Id.* Dr. Borden expressed surprise because she would expect the records to exhibit greater limitations given Plaintiff's substance use issues. *Id.* Dr. Borden opined that the B criteria

including substance abuse established that Plaintiff had moderate impairment interacting with others; moderate impairment in concentration, persistence, and pace; and moderate impairment in terms of adapting and managing himself; however, did not establish problems regarding understanding, remembering, and applying information. AR at 37. Dr. Borden further opined that she would limit Plaintiff to simple, repetitive tasks in a non-public work setting, and suggested that he would perform best in a slower paced kind of job that did not have high production quotas. *Id.* at 38. Dr. Borden clarified her pace limitation was meant to preclude very fast paced quota type settings, and opined that aside from the public contact, Plaintiff could perform a job such as his employment as a convenience store cashier. *Id.* Dr. Borden observed that Plaintiff's ability to obtain and/or deal drugs on the street indicated some sort of street savvy or ability to handle oneself in a dangerous situation. *Id.* at 38–39.

Plaintiff's counsel pressed Dr. Borden regarding her opinion that Plaintiff had only a moderate limitation in adapting and managing himself. *Id.* at 39–40. Dr. Borden reiterated that the treatment records generally indicated that Plaintiff was stable, and often indicated that his mood and judgment were okay, and in her opinion the record did not establish a marked impairment, "even given the significant drug use issues." AR at 40. Dr. Borden disagreed with Plaintiff's counsel's characterization of fair insight and fair judgment as equivalent to no insight or no judgment. *Id.* at 40–41. Dr. Borden reiterated her opinion that the mental status examinations contained in the medical records failed to establish a marked impairment. *Id.* at 41. Plaintiff's counsel attempted to elicit an opinion regarding Plaintiff's ability to maintain employment; however, she had already expressed that talking about jobs was beyond her area of expertise. *Id.* at 39, 41. Dr. Borden confirmed that her opinions were based upon the objective evidence. *Id.* at 42.

Plaintiff's counsel asked whether Dr. Borden agreed that Plaintiff's hallucinations beginning at age eight (8). AR at 42. Dr. Borden observed that the record says age eight (8) in some places and third grade in others. *Id.* Dr. Borden agreed that the records reflected Plaintiff's drug use began during his teen years. *Id.* Dr. Borden further opined

that an individual who begins using drugs in their formative years would not be developing the various skills that would be helpful to manage oneself in life. *Id.* at 42–43.

## II.    STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). "Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (citations omitted) (alterations in original).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

### III.    ANALYSIS

#### A.    *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step One asks is the claimant "doing substantial gainful activity[?]"  20 C.F.R. § 404.1520(a)(4)(i).  If yes, the claimant is not disabled.  Step Two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  20 C.F.R. § 404.1520(a)(4)(ii).  If not, the claimant is not disabled.  Step Three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  20 C.F.R. § 404.1520(a)(4)(iii).  If not, the claimant is not disabled.  Step Four considers the claimant's residual functional capacity and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If claimant can still do past relevant work, then he or she is not disabled.  Step Five assesses the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. *Id.*

In the instant case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date of November 19, 2020.  AR at 18.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: substance abuse, depression, and anxiety (20 CFR 416.920(c))." *Id.*  At step three, the ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." *Id.* at 19.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  The claimant is limited to simple routine tasks with no public contact as part of his specified work duties; and jobs that do not involve a high-rate production quota."

*Id.* at 21.  At step four, the ALJ found that "[t]ransferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968)."  *Id.* at 24.  At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, 416.969a)."  AR at 24.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.* at 15, 25.

### B.    *Plaintiff's Symptom Testimony*

Plaintiff asserts that the ALJ failed to "articulate clear and convincing reasons to discount Mr. Sanchez'[s] symptom testimony[.]"  Opening Br. (Doc. 18) at 5–9.  Plaintiff further asserts that the ALJ did not set forth sufficiently specific reasons "to allow a reviewing court to conclude [he] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony."  *Id.* at 6 (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015)).  Defendant urges that the ALJ's rationales for discounting Plaintiff's statements were sufficiently clear, because he pointed to inconsistencies with the objective medical evidence, Plaintiff's improvement with medication, and inconsistencies with Plaintiff's activities of daily living.  Response (Doc. 22) at 2–4.  The Court agrees with Defendant, the ALJ properly discounted Plaintiff's symptom testimony.

### 1.  <u>Legal Standard</u>

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  Further, "the claimant need not show that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it

could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of h[is] symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

### 2. Analysis

The ALJ analyzed the severity of Plaintiff's mental impairments against the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR at 19–21. Through this analysis, the ALJ considered Plaintiff's stated symptoms and compared them against the medical record evidence, including treatment records and consultative examiner reports. *Id.* The ALJ found that neither the "paragraph B" nor "paragraph C" criteria were not satisfied. *Id.* at 20. Next, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. *Id.* at 21. The ALJ provided a comprehensive review of Plaintiff's testimony, medical evidence, and other evidence in the file that he relied upon in his RFC determination. *Id.* at 21–23.

### a. Mr. Sanchez's reason for not working

Plaintiff argues that "the ALJ summarized Mr. Sanchez'[s] allegations regarding his reasons for not working as 'panic attacks and because he cannot deal with people'[;] . . . [h]owever, this downplays the extent of Mr. Sanchez'[s] allegations." Opening Br. (Doc. 18) at 5–6. At the December 15, 2021, hearing the following exchange took place between

the ALJ ("Q") and Plaintiff ("A"):

Q    And how long have you been hearing voices?

A    Since I was little, like, three.

Q    So, you were able to work at Circle K for a year –

A    Yes.

Q    – with the voices, right?

A    Yes.

Q    So, what's changed?

A    Nothing.

Q    Okay.  Well, why couldn't you go back to a job like Circle K?

A    The panic attacks I got, and the dealing with the people, and then having to do, like, the fine work, like, objective that couldn't get it done, and, like, too much, and then I get anxious really fast, and then I – I get freaked out, like, really freaked out, though, like, I start crying, or I start fighting, punching.

Q    Well, were you experiencing these problems when you were working at Circle K?

A    I mean, yeah, that's why I – I got let go, but –

Q    So you were there for a year?

A    Yes, I mean, because I get some things that I had to do, but I was mainly a third shift when no other – the third shift, so I – I wasn't really having to deal with any people.

AR at 62–63.  The record reflects that the ALJ's characterization of Plaintiff's testimony regarding why he could not return to work was accurate.  Furthermore, the record demonstrates that Plaintiff worked at Circle K while hearing voices, but Plaintiff's response demonstrates that he did not find them prohibitive to his ability to work.  *Id.*  The Court finds the ALJ did not err.

. . .

**b. Inconsistency with the medical evidence**

Plaintiff argues that "[o]bjective evidence alone cannot form the basis for an adverse finding." Opening Br. (Doc. 18) at 8. Plaintiff further asserts that "the ALJ at no point liked the evidence to [his] conclusion[,]" and his "failure on this point constitutes legal error requiring remand." Reply (Doc. 23) at 2.

"Here, the ALJ clearly and convincingly explained that [Sanchez's] symptom testimony failed to support the relevant disability factors because it was inconsistent with other evidence." *Rodriguez v. O'Malley*, 2024 WL 1714267, at *1 (9th Cir. Apr. 22, 2024) (citing *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)). "Throughout his Paragraph B analysis, the ALJ listed each disability factor, identified [Sanchez's] relevant symptom testimony, and then described record evidence supporting and undermining [his] testimony before determining [his] functional limitations." *Rodriguez*, 2024 WL 1714267, at *1. For example, when considering Plaintiff's limitations with interacting with others, the ALJ stated:

> In understanding, remembering, or applying information, the claimant has no limitation. In his function report, the claimant stated that he has problems with memory, understanding and following directions due to his condition (Ex. 3E/6[; AR 257]). However, the claimant's recent and remote memory were consistently intact or normal, and he was noted to have an average fund of knowledge (Exs. 1F/4, 2F/8, 3F/4, 4F/3, 6F/3, 7F/13, 10F/3, 11F/18[; AR 319, 561, 585, 591, 624, 655, 995, 1060]). Therefore, the undersigned finds that the claimant does not have any limitation in this area.

AR at 19. "When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) (emphasis in original). "[A]n ALJ is not 'required to believe every allegation of disabling [symptoms], or else disability benefits would be available for the asking, a result plainly contrary to' the Social Security Act." *Id.* at 499 (quoting *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 404.1502(a)). "Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v.*

*Commissioner Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2007) (citation omitted). "Ultimately, the 'clear and convincing' standard requires an ALJ to show his work, which the ALJ did here." *Smartt*, 53 F.4th at 499.

Plaintiff further asserts that NP Rodric Falcon "did not perform a new mental status examination at every visit," characterizing his entries as "mostly a single mental status examination taken early in his treating relationship with Mr. Sanchez with some minor adjustments along the way." Opening Br. (Doc. 18) at 7–8. Plaintiff argues that the ALJ's reliance on these records is misplaced. *Id.* at 8. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted). The Court will not reweigh the evidence. Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). The Court finds that the ALJ properly outlined objective evidence that undermined Plaintiff's testimony. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014). The Court further finds that the ALJ's explanation was "specific, clear and convincing" and he did not err.

### c. Improvement with treatment.

In his Paragraph B analysis, the ALJ considered Plaintiff's ability to interact with others. AR at 19. The ALJ noted that "[i]n his function report, the claimant reported that he has problems getting along with others due to anxiety and violent outbursts." AR at 19 (citing AR at 256). The ALJ further noted that during his consultative examination, Plaintiff "endorsed having anger; however, he said it has been lessened by medications[.]" *Id.* (citing AR at 583). The ALJ similarly considered Plaintiff's report of symptom improvement with medication in determination of Plaintiff's residual functional capacity. AR at 22. Improvement in functioning with prescribed medication is a valid reason to discount symptom testimony. *Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023). The Court finds that the ALJ did not err.

#### d. Activities of daily living

In analyzing Plaintiff's ability to adapt or manage himself, the ALJ considered Plaintiff's reports that "he did not have any problem with his personal care, but needed reminders from his mother to take his medication; could sometimes prepare his own meals; does some yard work and laundry, but does not finish; can drive a car and go out alone; and can shop by computer for electronics, music, and movies[.]"  AR at 20 (citing AR at 253–55).  The ALJ next considered the Consultative Examiner's description of Plaintiff's hygiene and grooming, despite appearing nervous, and determined Plaintiff had a moderate limitation in adaptation.  *Id.* (citing AR at 584).  The ALJ did not, however, contrast Plaintiff's symptom testimony in the reports with those provided to Dr. Rohen, the CE, which endorsed a greater level of daily activity than his representations to the Commissioner.  The ALJ's limited analysis in this regard does not meet the "clear and convincing" standard; however, because, as discussed above and looking at the record as a whole, sufficient reasons exist for rejecting Plaintiff's symptom testimony,  the Court finds this error harmless.  *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[W]e may not reverse an ALJ's decision on account of an error that is harmless."), *superseded on other grounds by* 20 C.F.R. § 404.1502(a); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1193 (9th Cir. 2004) ("the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record").

#### e. Conclusion

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quotations and citations omitted).  The Court finds that the ALJ's symptom "finding is supported by substantial evidence in the record, [and as such,] we may not engage in second-guessing."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citations omitted).

### C.    *Medical Opinion Evidence*

Plaintiff asserts that "the ALJ did not explain the persuasiveness of Dr Rohen's

opinion in terms of supportability and consistency with the record because the ALJ ignored the most probative part of Dr. Rohen's opinion." Opening Br. (Doc. 18) at 18.

Section 404.1520c, 20 C.F.R., governs the analysis of medical opinions for disability claims filed on or after March 27, 2017. "Under the revised regulations, 'there is not an inherent persuasiveness to evidence from [government consultants] over [a claimant's] own medical source(s), and vice versa.'"[8] *Woods v. Kijakazi*, 32 F.4th 785, 791 (9th Cir. 2022) (alterations in original) (quoting Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5844)). Rather, medical opinions are evaluated pursuant to the factors set forth in Section 404.1520c(c)(1)–(5), with the most important factors being supportability and consistency. 20 C.F.R. § 404.1520c(c); *see also* 20 C.F.R. § 404.1520c(b)(2). The regulations specifically require the ALJ to explain how he or she considered supportability and consistency in evaluating medical opinions and making the disability determination. 20 C.F.R. § 404.1520c(b)(2). Additionally, the ALJ may, but is not required to, consider other factors such as the medical source's relationship with the claimant, the medical source's area of specialization, or "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. 404.1520c(c)(3)–(5). An ALJ, however, need not recite the "magic words" for a reviewing court to draw specific and legitimate inferences from the ALJ's opinion. *Magallenes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

Here, the ALJ noted that Dr. Rohen "appears to have opined that the claimant is capable of at least simple tasks and would be happier in a lower demand and more static position[.]" AR at 23. The ALJ further observed that Dr. Rohen "support[ed] this opinion with the results of her interview and examination results." *Id.* (citing Ex. 3F (AR at 582–88)). The ALJ found that Dr. Rohen's "somewhat vague opinion is nevertheless generally

[8] The Ninth Circuit Court of Appeals has held that its previous "requirement that ALJs provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion . . . is . . . incompatible with the revised regulations. *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

consistent with the overall treatment record and mental status examination results (Exs. 1F/4, 1F/11, 1F/19–20, 1F/27–28, 1F/33–34, 1F/43–44, 1F/50–51, 2F/3, 2F/8, 3F/3–4, 4F/3, 4F/8, 8F/13, 8F/31–32, 8F/43, 8F/52, 10F/3, 11F/18).” AR at 23.  Based on this, the ALJ found “her opinion generally persuasive.” *Id.*  The ALJ incorporated Dr. Rohen's opinion into the residual functional capacity, limiting Plaintiff to “simple routine tasks . . . and jobs that do not involve a high-rate production quota.” *Id.* at 21.  The Court finds that the ALJ properly evaluated Dr. Rohen's opinion.  What Plaintiff seeks, is for this Court to reweigh the evidence, which it will not do.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)) (Where “the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.”); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

## IV.    CONCLUSION

Based on the foregoing, the Court finds the ALJ properly assessed Plaintiff's symptom testimony and medical opinion evidence of record.

## V.    RECOMMENDATION

For the reasons delineated above, the Magistrate Judge recommends that the District Judge enter an order DENYING Plaintiff's Opening Brief (Doc. 18) and AFFIRMING the Commissioner's decision for further consideration.

Pursuant to 28 U.S.C. § 636(b) and Rule 72(b)(2), Federal Rules of Civil Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  No replies shall be filed unless leave is granted from the District Judge.  If objections are filed, the parties should use the following case number: **CV-23-0200-TUC-RM**.

Failure to file timely objections to any factual or legal determination of the

Magistrate Judge may result in waiver of the right of review.

Dated this 17th day of July, 2024.

Eric J. Markovich
United States Magistrate Judge